UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ESSEX INSURANCE COMPANY,

       Plaintiff,

v.

DETROIT BULK STORAGE,
UNITED STATES STEEL CORP
and PRAXAIR, INC.

       Defendants,
_____/

DETROIT BULK STORAGE, INC.

       Counter Plaintiff,

v.

ESSEX INSURANCE COMPANY,

       Counter Defendant,
_____/

DETROIT BULK STORAGE, INC.

       Cross Plaintiff,

v.

FRANKENMUTH MUTUAL INSURANCE
COMPANY, UNITED STATES STEEL CORP.,
and PRAXAIR, INC.

       Cross Defendants.
_____/

Case No. 11-13277

Paul D. Borman
United States District Judge

Michael J. Hluchaniuk
United States Magistrate Judge

OPINION AND ORDER:
(1) GRANTING ESSEX'S MOTION FOR SUMMARY JUDGMENT (Dkt. No. 215);
(2) DENYING AS MOOT ESSEX'S OBJECTION TO THE MAGISTRATE JUDGE'S ORDER
(Dkt. No. 184); AND
(3) DISMISSING DBS'S COUNTER CLAIMS AGAINST ESSEX (Dkt. No. 55)

Now before the Court is Plaintiff Essex Insurance Company's ("Essex") Motion for Summary Judgment filed on November 22, 2013. (Dkt. No. 215).[1] Defendant Detroit Bulk Storage, Inc. filed a response on December 16, 2013. (Dkt. No. 202). Defendant Praxair, Inc. and Defendant United States Steel Corporation also filed responses. (Dkt. Nos. 204 & 206). Thereafter, Essex filed its replies. (Dkt. Nos. 205 & 207).

A hearing on this matter was held on May 14, 2014 at 2 PM.

## I. BACKGROUND

A.    Procedural History

This action arises from the structural failure of a dock which collapsed and created an open void on January 28, 2011. (Dkt. No. 118, giving date of incident). In addition to the structural failure of the dock, the salt which had been unloaded on to the dock prior to the collapse, fell into the void.

On July 27, 2011, Essex filed its original complaint seeking a declaratory judgment against Defendants Detroit Bulk Storage, Inc. ("DBS") and the Morton Salt Company ("Morton").[2] (Dkt. No. 1). Essex filed an amended complaint on August 17, 2011, adding United States Steel Corporation ("US Steel") and Praxair, Inc. ("Praxair") as defendants. (Dkt.

---

[1] There have been multiple versions of the summary judgment motion filed since the original was filed on November 22, 2013. A corrected version of the motion was filed shortly after the original was filed. (*See* Dkt. Nos. 192, 195, 196, 197). Then, after the Court struck Essex's "Statement of Undisputed Facts", Essex sought permission to re-filed the motion with citations and exhibits which had been attached to the "Statement of Undisputed Facts". (*See* Dkt. Nos. 198, 208, and 210). The most current version of the Motion and supporting brief are the ones to which this Opinion and Order refer are numbers 215 and 216 on the docket.

[2] This Court, pursuant to stipulation, dismissed all claims between Morton and Essex with prejudice on July 25, 2013. (Dkt. Nos. 176, 177).

2

No. 7).  The Amended Complaint seeks a declaratory judgment against all defendants regarding

Essex's obligations pursuant to a marine insurance policy issued to DBS.[3]

Thereafter, DBS filed a counter complaint against Essex and also a cross complaint

against Frankenmuth Mutual Insurance Company ("Frankenmuth"),[4] US Steel, and Praxair.

(Dkt. No. 55).  Defendant Morton also filed a cross claim against Frankenmuth, Praxair, and

Essex.  (Dkt. No. 52).  However, all of Morton's claims against these parties have been

dismissed, as have Essex's claims against Morton.  (Dkt. Nos. 123, 174, 176).  As a result,

Morton is no longer a party in this action.  Defendant US Steel also filed a cross claim against

DBS which it later voluntarily dismissed.  (Dkt. Nos. 36, 131).

On May 23, 2012, the Court denied Defendant Morton's motion to dismiss based on lack

of subject matter jurisdiction (or seeking abstention in the alternative) and held that admiralty

jurisdiction applied to the marine insurance policy at issue because "the principal objective of

the contract is to insure against loss to ships and their cargo and equipment while they are

docked at the wharf."  (Dkt. No. 47, at 6).  Then, on December 28, 2012, this Court recognized

that "[t]he sole basis for federal jurisdiction that has been asserted in this matter is Plaintiff's

claim of admiralty jurisdiction under 18 U.S.C. § 1333(1).  There are no claims arising under

_____

[3] DBS and Morton also filed suit in Wayne County Circuit Court against Essex and Frankenmuth alleging breach of insurance contract and seeking a declaratory judgment based on the same incident, however the state court granted Essex's motion for summary disposition and dismissed the action.  (*See* Dkt. No. 128, Pl.'s Mot. for Clarification, Ex. A State Court Order, case no. 11-010712-CZ).  Defendant Praxair also filed in state court asserting claims against Morton and DBS.  (*See* Dkt. No 216, Ex. W, Praxair State Complaint against DBS and Morton Salt, Inc., filed on October 1, 2012).  Defendant US Steel thereafter intervened in the Praxair action (and as a result dismissed its cross claim in this Court as duplicitous).  (*See* Dkt. No. 119, Ex. B, US Steel Motion to Intervene & Dkt. No. 131, Order granting voluntary dismissal).

[4] Defendant Frankenmuth is the carrier of DBS's general commercial insurance policy.

3

federal statutes, and there is no diversity of citizenship among [any of] the parties." (Dkt. No.

113, at 5). The Court further noted that:

> Plaintiff's claims in the instant matter are [] limited to the dispute regarding
> coverage of the marine insurance policy between Plaintiff and Defendants DBS
> and Morton. This is not a general negligence action. Furthermore, neither
> Defendants Praxair nor Frankenmuth [nor US Steel] is a party to the contract of
> marine insurance at issue.

(*Id*.). For these reasons, this Court found that the "relevant inquiry in this matter is therefore

whether the incident on January 28, 2011, involved any ship, ship's cargo, or ship's equipment,

and whether the incident arose out of Defendant DBS's mooring and docking operations." (*Id*. at

6). The Court then ordered the parties to only conduct discovery on the issue of Essex's liability

under the admiralty wharfinger insurance contract at issue and stayed all other pending matters.

(*Id*.). Specifically, the Court noted that after the limited discovery was competed the parties

could file "motions regarding Plaintiff's liability under the Essex wharfinger insurance contract."

(*Id*.).

      At this point in time the only actions left are: (1) Essex's declaratory judgment against

Defendants DBS, Praxair, and US Steel (Dkt. No. 7); and (2) DBS's cross action against Essex,

Praxair, Frankenmuth, and US Steel (Dkt. No. 55). However, DBS's cross claims against

Praxair, Frankenmuth and US Steel were stayed by the Court's December 28, 2012 opinion and

order (Dkt. No. 113). The Court notes that Essex's current motion seeks summary judgment on

all claims asserted by Essex against DBS and all claims DBS has asserted in its counter-

complaint against Essex. (Dkt. No. 215, at 1).

      There is also an outstanding Objection by Essex to a Magistrate's Order which denied

Essex's motion for a protective order. (Dkt. No. 184). On June 4, 2013, DBS requested the

4

deposition of Essex's claims examiner who made the decision to deny the insurance claim.  In response, Essex filed a motion for protective order seeking to prevent DBS from taking the deposition arguing that the request was outside the relevant scope of discovery.  (Dkt. No. 158). The motion was referred to Magistrate Judge Hluchaniuk, who held a telephonic hearing on the matter after it was fully briefed.  In the October 3, 2013 Order, Magistrate Judge Hluchaniuk denied Essex's requested protective order, holding that:

> There has been no finding by the Court as to ambiguity regarding the wharfinger policy at issue, and no likely finding by the Court any time soon, as there is no pending dispositive motion regarding the ambiguity of the policy.  Accordingly, the undersigned finds that there is no basis to limit discovery as contended by plaintiff's motion.  Although the determination of whether a contract is ambiguous is a question of law for the court to decide, plaintiff here is putting the cart before the horse, presuming the contract is not ambiguous and thus no extrinsic evidence will be allowed and no discovery of the claims examiner is necessary.

(Dkt. No. 183, at 6).

The Court finds that this Objection is subsumed (and therefore mooted) by the current motion for summary judgment because the motion for summary judgment encompasses DBS's argument that the policy is ambiguous and this Court ultimately addresses the issue of whether there is coverage provided by the policy.  Indeed, the Magistrate Judge anticipated this, noting that he had attempted to wait for the Essex's motion for summary judgment prior to issuing his the ruling.

The Court also recognizes that Defendants Praxair and US Steel have both submitted responses to Essex's current motion for summary judgment in which both Defendants dispute Essex's factual findings regarding the cause of the dock failure at issue in this action.

B.      Wharfinger Insurance Policy and Collapse of Dock

The pertinent insurance policy in this action is a "Wharfinger's legal liability" policy issued by Essex to DBS and Morton (which was listed as an additional insured on the policy). (Pl.'s Br. Ex. I, Policy No. 9CC4502-3, Eff. Date 7/16/2010 - 7/16/2011)[5]. On June 21, 2004, DBS submitted an application for insurance to Essex through its insurance agent, J.M. Wilson, for wharfinger's legal liability coverage. (Ex. A).

DBS is a limestone supply company which purchases and stores limestone. (Ex. L, Noel Frye Dep. at 11). DBS also stores products that it does not own such as coal and salt. (*Id*.). DBS operates from a fifteen acre dock located at 530 E. Great Lakes Ave., River Rouge, MI 48218. (*Id*. at 12-13). DBS leases this dock from US Steel ("River Rouge Dock"). (*Id*.; Ex. K, Lease).

Noel Frye, Vice President of Marine Traffic at DBS, testified that in an average year, fifteen to thirty vessels dock at DBS - approximately one every ten days. (N. Frye Dep. at 16). Generally, the vessels that dock at DBS are "self-unloading vessels".[6] (*Id*. at 7, 17:6-7). When a vessel arrives at the River Rouge Dock, typically the crew of the vessel will throw out heaving lines. (*Id*. at 18). These heaving lines are then attached to cables, which are attached to the winches on the vessel itself. (*Id*.). The cables are secured onto "tie-ins" on the dock and then vessel is considered to be secured to the dock. (*Id*. at 18, 23). The product is then unloaded

---

[5] For ease of reference, all citations to exhibits will refer to exhibits attached to Essex's brief unless noted otherwise.

[6] A self-unloader is described as "a big conveyor belt, basically, that is attached to the boat that swings from the boat over top of the dock and unloads the – unloads cargo." (N. Frye Dep. at 25). The unloading process using a self-unloader generally takes anywhere between five and nine hours depending on the amount of product and the speed of the conveyor belt. (*Id*. at 25-26).

6

directly on to the River Rouge Dock. (*Id*. at 26). If there is product already on the dock and a second vessel arrives with the same product, that product will be unloaded onto the existing pile of product. (*Id*.). After the product is unloaded, the vessel departs usually "within fifteen, twenty minutes." (N. Frye Dep. at 28). When salt is unloaded, DBS then must tarp the salt and also "take the peaks and valleys out of it" by shaping the salt piles with a bulldozer. (*Id*. at 30).

Morton and DBS have had a contractual, business relationship for approximately twenty years. (*Id*. at 12). DBS stores Morton's salt at its River Rouge Dock pursuant to the terms of a Salt Storage Handling Agreement ("Salt Agreement"). (Ex. J, Salt Agreement). Pursuant to the Salt Agreement, Morton required that DBS acquire a "wharfinger's legal liability" policy and list Morton as an extra insured on the policy. (Ex. J, at 9, 20). The Salt Agreement noted that DBS needed "[c]overage for loss or damage to vessels while in Contractor's care, custody and control, as well as damage to other real personal property caused by such vessels". (*Id*. at 9).

1.    Collapse of Dock

On January 27, 2011 at 5:00 AM, a self-unloading vessel, the Mississagi, docked at the River Rouge Dock. (Ex. N, Morton Salt Barge or Vessel Unloading Receipt, Bill of Lading). At 5:25 AM that vessel began unloading 12,939 tons of salt on to the River Rouge Dock. (*Id.*). As evidenced by the unloading receipt, the unloading was completed that same day at 9:30 AM. (*Id*.).

Some time in the early morning of January 28, 2011, the River Rouge Dock structure failed. (DBS's Resp. Ex. B, Notice of Occurrence Letter; N. Frye Dep. at 37-38; Ex. N, at 6, DBS Inventory Report stating "Dock failure happened early on Jan. 28th/2011"; *see* Exs. Q, R & S Pictures of collapse). That morning at 7:30 AM, Noel Frye, received a phone call from his

7

brother John Frye, Vice President of Sales at DBS, advising him that the River Rouge Dock had

collapsed.[7]  (N. Frye Dep. at 37-38).  Noel Frye visited the dock at 9:00 AM that day and did not

observe a vessel docked at that time.  (*Id*. at 38).

Due to the River Rouge Dock collapse and resulting "soil shift" Praxair's process cooling

water supply lines and the electric conduit which ran beneath the River Rouge Dock to the

Praxair's Ecorse Plant were severed.[8]  (Ex. W, Praxair State Complaint, ¶ 13).

DBS notified Essex of the collapse via letter dated April 4, 2011 stating "[o]n January 28,

2011, the Great Lakes Steel Dock experienced a failure.  The failure occurred on a section of the

dock that was supporting piles of bulk salt belonging to the Morton Salt Company. An unknown

amount of bulk salt subsequently fell into the void left by the failure of the Great Lakes Steel

Dock."  (DBS's Resp. Ex. B, Notice of Occurrence Letter).

2.      Wharfinger Insurance Policy, 9CC4502-3

---

[7] Noel Frye did not remember the exact date of the collapse but remembered the time
(7:30) when his brother called to relay the information to him.  Further, although it is unclear
from Noel Frye's testimony what day the dock collapsed, it is clear from the Receipt of
Unloading that the salt was unloaded from 5:25 AM until 9:30 AM on January 27, 2011.  (Ex.
N).  Therefore, it is impossible that the collapse or dock failure would have occurred at the time
the vessel was being unloaded since Noel Frye testified he viewed the collapsed dock at 9:00
AM and there was no vessel present (let alone in the act of still unloading salt).  (N. Frye Dep. at
38).  There is also a handwritten entry on DBS's own Inventory Report stating that "Dock failure
happened early on January 28, 2011 some load[s] were shipped out prior to failure." (Ex. N, at
6).  DBS's assertion in its response that "DBS was in the process of receiving the materials that
were unloaded from a ship chartered by Morton Salt" when the collapse happened blatantly
misconstrues the record in this action.  (DBS's Resp. at 2).

[8] Praxair produces industrial gases at various production facilities throughout the United
States, including a location near the Detroit River known as the "Ecorse Plant".  (Ex. W, at 7-8).
The Ecorse Plant uses water from the Detroit river to cool certain process equipment.  (*Id*. at 8).
Praxair's pipes run underground from the Detroit River to the Ecorse Plant along an easement
granted by US Steel and beneath the River Rouge Dock.  (*Id*. at 8).

The "wharfinger legal liability" policy ("Wharfinger Policy") in effect at the time of the

occurrence was number 9CC4502-3, effective from July 16, 2010 until July 17, 2011.  (Ex. I).

The policy had been renewed each year since it was first originally purchased by DBS in 2004.

(*See* Exs. A-I).

> The Supplemental Declarations form of the Wharfinger Policy states:
> BUSINESS DESCRIPTION AND LOCATION OF PREMISES COVERED BY
> THIS POLICY
>
> Form of Business: ... Organization (other than Partnership or Joint Venture)
>
> Location of all premises you own, rent, or occupy: 530 E. Great Lakes Ave.,
> River Rouge, MI 48218

(Ex. I, at 2).  Pursuant to the "OMWFLL 2/09" endorsement form, the "Wharfinger's Legal

Liability" policy provides:

> 1.      This company will pay those sums, that the Insured, as Wharfingers,
>         become legally obligated to pay as damages because of liabilities imposed
>         upon the Insured because of accidental loss or damage which may occur:
>
>         A.      To watercraft and equipment, cargoes, freights, and other interests
>                 on board while in the care, custody or control of the Insured;
>
>         B.      To any property caused by said watercraft and their cargoes;
>
>         all while at the locations described in the **Liabilities Coverage Part
>         Supplemental Declarations** or adjacent moorings and resulting from or
>         arising out of the Insured's mooring or docking operations.

(Ex. I, at 7) (emphasis in original).  The Wharfinger policy then sets forth enumerated exceptions

to the liability coverage, including in relevant part, that the policy does not apply to:

> J.      Loss of or damage to property owned, rented, leased or chartered to the
>         Insured, or in the Insured's possession for storage, or utilized by the
>         Insured or any affiliated or subsidiary concerned individual or party.

(*Id*.).

9

## II. STANDARD OF REVIEW

Plaintiff has moved for summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure. This rule provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of genuine issue of material fact." *Id*. at 323; *see also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting BLACK'S LAW DICTIONARY 881 (6th ed. 1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable

10

inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. FED. R. CIV. P. 56(e). The rule requires that non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

### III. ANALYSIS

As an initial matter the Court observes that Essex's arguments in its motion for summary judgment motion and DBS's response are, excuse the pun, like two ships passing in the night. Essex's argument, whittled to its relevant core, is that the River Rouge Dock collapse does not fall within the Wharfinger Policy and also that an exclusion applies such that the dock collapse is not a covered occurrence. DBS does not address this argument in its response but instead contends that the Wharfinger Policy is "latently" ambiguous and/or constitutes an illusory promise and, therefore, genuine issues of material fact regarding the coverage of the policy remain and summary judgment should be denied. The Court will therefore address both of these arguments.

A.      Is the Policy Ambiguous?

1.      Choice of Law regarding Contract Interpretation

As this Court previously determined, the Wharfinger Policy at issue in this action is a marine insurance policy.  (Opinion and Order Denying Motion to Dismiss, Dkt. No. 47, at 6).  "[M]aritime contracts are governed by federal admiralty law when there is an established rule, but absent such a rule, state law applies."[9] *Royal Ins. Co. of Amer. v. KSI Trading Corp.*, 563 F.3d 68, 73 (3d Cir. 2009) (citing *Wilbur Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 313-14 (1955) (holding that "there is no applicable federal rule governing the construction of the Policy at issue" and applying New Jersey law determine whether an ambiguity existed in the contract)); *see also Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 28 (2004) (noting that even then federal maritime law applies, "[a] maritime contract's interpretation may so implicate local interests as to beckon interpretation by state law.").  The Court notes there is not any specific, judicially-created federal rule governing the interpretation of this maritime insurance contract, nor does it appear the any federal statute is applicable in this action.  *See Wilburn Boat Co.*, 348 U.S. at 314, 321 ("Since Congress has not taken over regulation of marine insurance contracts ... there is no possible question here of conflict of between a state law and any federal statute"); *see also Continental Ins. Co. v. Roberts*, 410 F.3d 1331 (11th Cir. 2005) (finding no federal rule applicable in analyzing and applying Florida state law to interpret the term "household" in maritime insurance contract);  *Littlefield v. Acadia Ins. Co.*, 392 F.3d 1, 6 (1st Cir. 2004)

---

[9]  DBS assumes without argument that Michigan law applies to the issue of contract interpretation.  Essex however, argues that admiralty law governs the "substantive law" regarding the interpretation of marine insurance contract terms.  (Pl.'s Br. at 15).  The Court finds that Michigan law applies to contract interpretation for the reasons set forth above and notes that regardless, both Michigan law and admiralty law are consistent on these issues.

(evaluating whether to apply federal or state law to the interpretation of a maritime insurance contract and finding that there is no special, applicable federal rule) (citing *Commercial Union Ins. Co. v. Flagship Marine Servs. Inc*., 190 F.3d 26, 30 (2d Cir. 1999)).  The Court finds that general rules of contract law govern the interpretation of marine insurance polices.  *See Littlefield*, 392 F.3d at 6 (noting that "general principles of contract law are used to interpret marine insurance polices.") (citing *Kalmbach, Inc. v. Ins. Co. of the State of Penn*., 529 F.2d 552, 555 (9th Cir. 1976)); *F.W.F., Inc. v. Detroit Diesel Corp*., 494 F. Supp.2d 1342, 1356 (S.D.Fla. 2007) (quoting Williston on Contracts, § 30:4) (4th Ed. 2006) (noting "general federal maritime law has adopted the standard axiomatic rules of contract interpretation and construction".).

Lastly, there is no reason for the Court to fashion a new federal rule regarding this issue of contract interpretation.  *See Littlefield*, 392 F.3d at 7 (declining to fashion a new federal rule when evaluating whether an exclusion in a maritime insurance contract was ambiguous as applied or whether the policy was illusory) (citing *Acadia Ins. Co. v. McNeil*, 116 F.3d 599, 603).

Therefore, the Court will apply Michigan contract law in evaluating whether the Wharfinger Policy language is ambiguous.

2.      Michigan Principles of Contract Interpretation

Pursuant to Michigan law, an insurance policy is treated the same as any other contract and courts should be guided by the "well-established principles of construction."  *McKusick v. Travelers Indem. Co.*, 246 Mich. App. 329, 332-33 (Mich. Ct. App. 2001).  "The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties."  *City of Grosse Pointe Park v. Mich. Municipal Liability and Property Pool*, 473 Mich. 188, 197 (2005) (quoting *McIntosh v. Groomes*, 227 Mich. 215, 218 (1924)); *Allstate Ins. Co. v. Keillor*, 450 Mich. 412,

417 (1995).

"Under Michigan law, the proper interpretation of an insurance policy and determination of whether the policy language is ambiguous are questions of law to be determined de novo by the court." *Ann Arbor Pub. Schools v. Diamond State Ins. Co.*, 236 F. App'x 163, 165-66 (6th Cir. 2007) (citing *Klapp v United Ins. Group Agency, Inc.*, 468 Mich. 459 (2003)). "A contract is ambiguous when its provisions are capable of conflicting interpretations." *Farm Bureau Mut. Ins. Co. of Mich. v. Nikkel*, 460 Mich. 558, 566 (1999). The Michigan Supreme Court has explained that

> [i]f a fair reading of the entire contract of insurance leads one to understand that there is coverage under particular circumstances and another fair reading of it leads one to understand there is no coverage under the same circumstances the contract is ambiguous and should be construed against its drafter and in favor of coverage.

*Id.* (quoting *Raska v. Farm Bureau Mut. Ins. Co.*, 412 Mich. 355, 362 (1982)). Further, while a policy will be construed against its drafter if it is ambiguous, "this does not mean that the plain meaning of a word or phrase should be perverted, or that a word or phrase, the meaning of which is specific and well recognized, should be given some alien construction merely for the purpose of benefitting an insured." *Henderson v. State Farm Fire and Cas. Co.*, 460 Mich. 348, 354 (1999) (internal citation omitted). Courts should interpret the terms of a contract in accordance with their common meanings. *Id.*

In this action, DBS contends that the ambiguity in the Wharfinger Policy is a "latent" ambiguity. A latent ambiguity is one "that does not readily appear in the language of a document, but instead arises from a collateral matter when the document's terms are applied or executed." *City of Grosse Pointe Park*, 473 Mich. at 198 (quotation omitted). The Michigan Supreme Court has explained that a court may consider extrinsic evidence which demonstrates

14

such a latent ambiguity:

> [A]ttendant facts and circumstances explain the context in which the words were used and may reveal the meaning the parties intended.  In this respect, the detection of a latent ambiguity unquestionably requires the consideration of factors outside the policy itself.  Therefore, extrinsic evidence is admissible to prove the existence of the ambiguity, and, if a latent ambiguity is proven to exist, extrinsic evidence may then be used as an aid in the construction of the contract.

*Id.* at 201 (internal citations and quotation marks omitted).

    3.      Possible Ambiguities

DBS spends much of its response defining "ambiguity" but decidedly little space establishing the existence of one in the Wharfinger Policy.  DBS first appears to argue that the language in the Wharfinger Policy is "inherently" ambiguous as to whether the cargo must be on board a vessel.   The relevant language of the policy states that Essex is liable for damages

> because of liabilities imposed upon the Insured because of accidental loss or damage which may occur:

> A.      To watercraft and equipment, cargoes, freights, and other interests on
>         board while in the care, custody, or control of the Insured.

> B.      To any property caused by said watercraft and their cargoes.

> ...

(Ex. I).

Essex contends and the Court agrees that this language is not ambiguous.  Essex argues that the use of the word "other" in Section A signals that the words preceding it are modified by the term "interests on board" because, "other" is defined "being or designating the remaining one of two or more" or "the remaining ones of several".  *See* Webster's II Dictionary (1988). Therefore, the words "equipment, cargoes, freights" are modified by the phrase "interests on board" and are all part of a group of items that are "on board" a watercraft.  This interpretation

15

follows the rule of *ejusdem generis*: "A canon of construction holding that when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed."  Black's Law Dictionary 631 (10th Ed. 2014).  The Court also recognizes that if the word "other" were to be omitted from the sentence, then the term "interests on board" would clearly not modify the items "equipment, cargoes, freights" and the term "interests on board" would become a wholly separate item.  However, this interpretation of the Wharfinger Policy would result in the word "other" being meaningless and mere surplusage.

Michigan law requires that "contracts must be construed so as to give effect to every word or phrase as far as practicable."  *Klapp*, 468 Mich. at 467 (citation omitted).  Here, reading the plain language and giving effect to the word "other" mandates a finding that coverage was only afforded to cargo while it was "on board" a watercraft or vessel.  Therefore, the Court finds that Section A is not ambiguous.

Next, to the extent DBS appears to argue that Section B of the Wharfinger Policy is ambiguous as to whether "cargoes" must be on a vessel this argument also fails.  In Section B, the pertinent language states "[t]o any property caused by said watercraft and their cargoes." (Ex. I at 7) (emphasis added).  The word "their" is defined as "used to indicate possession or the agent or recipient of an action".  *See* Webster's II Dictionary (1988).  Essex argues that Section B therefore provides "[t]o any property caused by said watercraft and cargo belonging to the watercraft".  (Pl.'s Br. at 6).  Essex contends that because the cargo must belong to the vessel, once the cargo is off the vessel "it ceases to be cargo belonging to that vessel and no contrary reading can be reasonable."  (Pl.'s Reply at 7).  The Court agrees.  It is clear from the word "their" that the Wharfinger Policy refers to cargo in the possession of aforementioned watercraft.

16

To construe the language to include cargo no longer on board the vessel or "in the possession" of the watercraft or vessel would make the use of the word "their" extraneous.

Therefore, to the extent DBS claims that the Wharfinger Policy is (patently) ambiguous in regards to coverage for cargo not aboard a vessel this argument is rejected.

DBS next argues "the Wharfinger Policy appears to cover any property [sic] caused by the watercraft or their cargo (the salt) while at the locations described in the Liabilities Coverage Part Supplemental Declarations (the premises DBS leases from US Steel at 530 E. Great Lakes Ave., River Rouge, MI 48218)". (DBS's Resp. at 19). DBS then notes that the exclusion contained in paragraph J excludes damage to any "property owned, rented, leased, or chartered to the Insured, or in the Insured's possession for storage, or utilized by the Insured ..." (Ex. I at 7). DBS then argues that the Wharfinger Policy therefore excludes coverage for what the policy purports to cover, namely "damage to a vessel chartered by or used by the insured and the salt that is owned by the insured, Morton, even while on board a vessel." (DBS's Resp. at 20). This argument fails on its face because it appears to be made on behalf of Morton (who chartered the vessel and who owned the salt), not DBS.

Morton was an additional insured on the Wharfinger policy and is no longer a party to this action. Pursuant to the "Additional Insured Endorsement", the "Liability coverages are amended to include": Morton Salt Company "as an additional insured under this policy, but only as respects negligent acts or omissions of the Named Insured and only for occurrences, claims, or coverages not otherwise excluded in the policy." (Ex. I, at 4). It is unclear from DBS's response what *exactly* it believes the latent ambiguity is as it applies to coverage for DBS *not* Morton. First, DBS has provided no case law or reason for why the Court should attempt to interpret this Wharfinger Policy based on a hypothetical scenario regarding an additional insured that is not

17

part of this action.  *See Littlefield*, 392 F.3d at 9 n. 9 (noting that the court need not decide

"whether an exclusion provision would be ambiguous as applied to other facts" and collecting

cases).  Second, DBS fails to address the fact that this Wharfinger Policy very clearly provides in

the additional insured endorsement that "[i]t is further agreed that where no coverage shall apply

herein for the Name Insured, no coverage nor defense shall be afforded to the identified

additional insured."  (Ex. I, at 4).  Therefore, on its face, the Wharfinger Policy only provides

coverage to Morton if the underlying occurrence is covered with respect to DBS.  However, as

the court in *Littlefield* stated "[w]e need not concern ourselves with factual scenarios not

presented by this case."  392 F.3d at 11.  DBS has not set forth how the Wharfinger Policy, as it

relates to the coverage afforded to <u>DBS as the named insured</u> is "latently ambiguous" as applied

to these facts.  Therefore, the Court rejects DBS's argument based on an alleged ambiguity as to

Morton.

To the extent DBS's argument can be understood to assert that the Wharfinger Policy is

latently ambiguous because it appears to cover *any* property damage caused by watercraft or

their cargo while at the River Rouge Dock but then its exceptions exempt any property owned,

leased, chartered, utilized or rented by DBS, this argument is rejected as well.  DBS's argument

appears to assume that the Wharfinger's Policy operates like a general liability policy and as

such DBS argues that the Wharfinger Policy was intended or was represented to "cover any

property [damage] caused by watercraft or their cargo" while at the River Rouge Dock.  (DBS's

Resp. at 19).  This is not so.  DBS poses the question in its brief: "If the [covered] property,

including the vessel, dock, and cargo is not owned, leased, chartered, in possession for storage or

used by the insured, what else could the [covered] property be?"  (DBS's Resp. at 19-20).  The

answer is simple – the property subject to coverage is property that is not owned by DBS.  The

18

clear language of the Wharfinger Policy provides protection for DBS, while operating as wharfingers, against a claim for accidental loss or damage to watercraft or their cargo (or to other property caused by those watercraft or cargo) by some third-party (i.e. owner of the vessel or the cargo, or owner of property destroyed or damaged by a vessel or its cargo). The Wharfinger Policy provides coverage for that damage or loss when such third-party damages arise from DBS's mooring and docking operations. Therefore, the coverage is not illusory.

       4.       Extrinsic Evidence

     As explained previously, Michigan courts allow the examination of extrinsic evidence to establish the existence of a "latent ambiguity" and if such an ambiguity exists, such evidence can be used "as an aid in the construction of the contract." *See City of Grosse Pointe Park*, 473 Mich. At 198-99, 201. "[W]here a latent ambiguity exists in a contract, extrinsic evidence is admissible to indicate the actual intent of the parties as an aid to the construction of the contract." *Id*. at 198. The evidence outside the four corners of the Wharfinger Policy that DBS relies upon to attempt to establish a latent ambiguity, however, is unpersuasive and irrelevant to the issues in this action.

     First, DBS urges the Court to review the previous incantations of the Wharfinger Policy to see that the terms were "dramatically less clear" and "significantly different". (DBS's Resp. at 19). The Court finds a review of the previous versions of the Wharfinger Policy does not reveal significantly different terms. The previous versions similarly and clearly excluded coverage for "any loss or damage to property or vessels owned, leased, or rented by the Assured and/or subsidiary companies." (DBS's Resp., Ex. K, OM-FLL Form, 2004 original policy form). Further, while the previous policies did not include an exclusion for property "chartered" or for property "in the Insured's possession for storage, or utilized by the Insured" it is clear that

the language of the endorsement only provided coverage for "loss of or damage to barges, scows and other vessels and/or cargoes on board all such vessels while moored at or adjacent to the piers and/or landings of the Assured".  (DBS's Resp., Ex. K at 8).  Therefore, the previous Wharfinger Policy did not cover damage to the River Rouge Dock, nor did it cover damages or loss to any cargoes stored on the dock.  Therefore, to the extent DBS argues that the previous versions of the policy shed light on the intention of the parties - it is clear that the parties did not ever contemplate coverage for damage to the River Rouge Dock itself or for loss of any cargo once it was no longer on a vessel.  Further, DBS's argument is unpersuasive because the mere fact that the policy language was changed or became more specific in its exclusions does not, *ipso facto*, make the policy ambiguous or illusory.  It is well settled that a court should not read ambiguity into a contract or insert uncertainty into clear and certain terms.  *Henderson*,  460 Mich. at 354.  To the extent DBS attempts to evidence ambiguity in the Wharfinger's Policy by relying upon email correspondence from attorney Gregory Thomas in which he asserts his opinion on the Wharfinger Policy's coverage, the Court finds that the email correspondence is far afield from any relevant issue.  Indeed, the Court recognizes that DBS claims Essex hired Gregory Thomas as DBS's legal counsel.  (DBS's Resp. at 23–25).  If this is true, then Gregory Thomas is merely DBS's attorney and the relevance of his opinion is neither binding on Essex, nor particularly relevant or material to this Court.  Further, DBS does not claim that Essex is somehow bound by the opinion offered by attorney Gregory Thomas or that estoppel would somehow operate to keep Essex from disputing this opinion.  Rather, DBS's argument appears to be simply that "the Wharfinger Policy must be susceptible to differing interpretations [because] the attorney/investigator hired by Essex to represent Detroit Bulk, who also happens to be an experienced licensed attorney", believed there was coverage.  (DBS's Resp. at 20).  There is no

logic in DBS's argument that the opinion of an attorney (either working for Essex or DBS) is somehow binding on this Court, and this extrinsic evidence does nothing to establish that the language of the policy is susceptible to two different meanings. Therefore, the Court rejects DBS's argument.

B.      Is the Policy an Illusory Promise

DBS argues in the alternative that the Wharfinger Policy (if not latently ambiguous) is nothing more than an illusory promise and Essex should not be allowed to avoid coverage. To this end DBS argues that the policy was "never fit for the purposes for which it was intended" because the policy "was invalid at the point of the first application. Essex knew the property was leased, but issued a policy that excluded coverage for leased property." (DBS's Resp. at 23). DBS further argues that the exclusions in paragraph J of the Wharfinger Policy exclude coverage for "any possible type of property". The Court finds that this argument is without merit.

An illusory contract is "defined as an agreement in which one party gives as consideration a promise that is so insubstantial as to impose no obligation. The insubstantial promise renders the agreement unenforceable." *Cincinnati v. Hall*, No. 09-001032, 2013 WL 3107640, *5 (Mich. Ct. App. June 20, 2013). The Michigan Court of Appeals explained in *Hall* that a similar concept exists in the realm of insurance where "the 'doctrine of illusory coverage' encompasses a rule requiring an insurance policy to be interpreted so that it is not merely a delusion to the insured. Courts avoid interpreting insurance policies in such a way that an insured's coverage is never triggered and the insurer bears no risk." *Id*. (citing *Ile v. Foremost Ins. Co*., 293 Mich. App. 309, 315-16 (2011), *rev'd on other grounds* 493 Mich. 915 (2012)). In *Hall*, the Michigan Court of Appeals recognized that the Michigan Supreme Court "will not strike an insurance policy as illusory if there is any manner in which the policy could be

21

interpreted to provide coverage." *Id*. at *6.

DBS's argument that the Wharfinger Policy is illusory illustrates the inherent misconception at the core of DBS's understanding of the Wharfinger Policy. The Wharfinger Policy is not a general liability policy and does not (and never did) provide coverage for damage to *DBS's* property (*i.e.* River Rouge Dock or any vessel owned, chartered, leased or rented or any property being stored or utilized by DBS). Rather, the Wharfinger Policy provides coverage for damages and accidental loss to watercraft and their cargo on board while in the care, custody or control of DBS, and any third-party's property damage or loss caused by those watercraft (or cargo on board) when the damage arises from DBS's operations "as Wharfingers" and "resulting from or arising out of [DBS's] mooring or docking operations." (Ex. I at 7).

DBS appears to be laboring under the false belief that the Wharfinger Policy was intended to cover damages to DBS's own property or property that was in its possession for storage, however, that interpretation is not supported by the plain language of the Wharfinger Policy. Further, the Michigan Supreme Court has "expressly rejected the notion that the perceived expectations of a party may override the clear language of a contract." *Ile v. Foremost Ins. Co.*, 493 Mich. 915 (2012). Therefore, where the Wharfinger Policy would indeed provide coverage for certain damages and loss to a third-party's property, the coverage provided to DBS is not illusory.[10]

---

[10] DBS also argues that Essex's motion for summary judgment should be denied as "untimely." (DBS's Resp. at 9). This argument is untimely and would have been better addressed in a motion to strike. Further, Essex asserts it was confused regarding the dispositive motion cut-off as the discovery deadline was extended and Essex believed it had two months from the end of discovery to submit a dispositive motion. DBS relies upon a non-binding district court case from Hawaii to advance its argument that a court has discretion to decline to entertain dispositive motions beyond a deadline. *See U.S. ex rel. Int' Bus. Machines Corp. v. Hartford Fire Ins. Co.*, 112 F. Supp.2d 1023, 1028 (D. Haw. 2000) (dismissing a cross motion for

C.      Liability

Essex's motion for summary judgment asserts that the Wharfinger Policy does not provide coverage for DBS's liabilities regarding the failure of the River Rouge Dock.  To this end, Essex sets forth its theory of causation regarding the failure of the River Rouge Dock. and relies upon the expert opinion of Noel Hargrave-Thomas, a geotechnical engineer.  (Ex. U, Hargrave-Thomas Affidavit; Ex. V, Hargrave-Thomas CV).  Essex claims that the cause of the dock collapse was due to "(1) the use of an unsupported open cut for the original installation of the PRAXAIR's pipes and (2) the settlement of the surface of the dock under the weight of the salt on top of the dock."  (Pl.'s Br. at 12, Ex. U L¶¶ 22-29).

Defendant Praxair filed a response to Essex's motion for summary judgment disputing Essex's representation that the Hargrave-Thomas report represents the "undisputed" cause of the dock collapse.  (Dkt. No. 204, at 1).  Rather, Defendant Praxair argues that the cause of the dock collapse was in no way caused by its pipes or their installation and "Essex's representations to the contrary are without foundation."  (*Id*. at 3).  Instead, Defendant Praxair asserts the cause of the collapse was due to the fact that "DBS allowed Morton to offload a massive mountain of salt and permitted the salt to tower above the required height limit–closer to the seawall than allowed– overloading the soil and causing a massive rupture of the earth".  (*Id*. at 7).  Defendant Praxair relies upon the Tim Bedenis, a geotechnical engineering and soil mechanics expert.  (*See* Dkt. No. 204, Ex. 1.A, Bedenis Report at 11).

Defendant US Steel also entered the fray surrounding Essex's alleged "undisputed"

---

summary judgment when the party filed it two months after the deadline and offered no reason).
In the current action, however, where DBS failed to move to strike the motion and Essex has
asserted a reason for its delay, declining to hear the motion would be an abuse of discretion and
not further the judicial economy of the Court.

reasons for the dock collapse in its response brief.  (Dkt. No. 206).  Defendant US Steel notes

that it has asserted the failure was due to DBS's loading and storage of salt piles in its cross-

claim against DBS and also that it has an expert who will testify that the failure was caused by

the height and location of the salt pile.  (*See* Dkt. No. 36, DBS Cross-Claim and Dkt. No. 206,

Ex. B, US Steel Supp. Answers to DBS's Interrogatories (in the state action); Ex. C, Anderson

Aff.).

Both Defendant US Steel and Defendant Praxair take issue with Essex attempting to

prove causation because both Defendants argue this Court stayed any discovery or inquiry into

causation when it ordered limited discovery on the issue of Essex's liability under the

Wharfinger Policy.  Essex argues, in contradiction of the Court's order, that discovery regarding

the cause of the dock failure is collateral to showing the Wharfinger Policy did not provide

coverage for the dock failure and therefore is pertinent.  This argument is of no moment to the

issue at hand.  Indeed, the Court need not (and will not) decide what caused the River Rouge

Dock failure, nor is it material that a question of fact exists regarding whether the cause of the

collapse was leaky pipes or a salt pile that was too high or too close to the seawall.  The Court

finds that the only material issue regarding causation is whether the damages and loss can be

attributed to the mooring and docking operations of DBS as set forth in the Wharfinger Policy.

(Ex. I at 7).

### 1.    Applicable Law

Essex asserts that substantive federal admiralty law governs the interpretation and

enforcement of the coverage terms of a marine insurance contract.  As explained in depth

previously, the Court finds that Michigan law governs the interpretation of the Wharfinger

Policy.  Further, there is no conflict between Michigan law and federal admiralty law in regards

24

to the interpretation of an insurance policy.  Indeed, under both the admiralty law and Michigan law, the burden is on the insured to show that the policy covered the damage suffered.  *Pioneer State Mut. Ins. Co. v. Dells*, 301 Mich. App. 368, 378 (Mich. Ct. App. 2013); *Gibbar v. Calvert Fire Ins. Co.*, 623 F.2d 41, 44 (8th Cir. 1980) ("The burden of proof generally is on the insured to show that a loss arose from a covered peril.") (applying admiralty law).  Further, "[w]hile the burden of proving coverage is on the insured, it is incumbent on the insurer to prove that an exclusion to coverage is applicable."  *Id*. (citing *Heniser v. Frankenmuth Mut. Ins. Co.*, 449 Mich. 155, 161 n. 6 (1995) (applying Michigan law); *New Hamphsire Ins. Co. v. Martech USA, Inc*., 993 F.2d 1195, 1199 (5th Cir. 1993) (finding that under Texas law and federal maritime law insured bore burden in showing the loss occurred during the policy periods, and insurers had the burden to show an exclusion applied.).

   2.   Coverage of Wharfinger Policy

   Essex argues that there are no issues of material fact regarding whether the Wharfinger Policy covers the River Rouge Dock collapse.  Essex asserts that for the Wharfinger Policy to provide coverage for liabilities accruing to DBS three separate things must have occurred: (1) that DBS be liable as a "wharfinger"; (2) DBS must be liable for (a) loss or damage to watercraft and equipment, cargoes, freight, and other interests on board while in the care, custody, or control of DBS <u>or</u> for (b) the loss or damage to any property caused by those watercraft and their cargoes; and (3) the liability of DBS must arise from DBS's mooring or docking operations. (Ex. I at 7).

   The Court notes that the term "wharfinger" is defined as "The owner or occupier of a wharf; one who for hire receives merchandise on his wharf, either for the purpose of forwarding or for delivery to the consignee on such wharf."  Black's Law Dictionary, 6th Ed. 1990.

25

Therefore, it appears from the plain language of the Wharfinger Policy that the covered liability must accrue against DBS in its capacity as "the ... occupier of a wharf" and one who "receives merchandise on his wharf."  Essex argues that the use of the term "wharfinger" in the Wharfinger Policy denotes a special set of duties and that DBS "must be liable as a wharfinger". (Pl.'s Br. at 17).  To the extent Essex's contends that the Wharfinger Policy and admiralty law require the Court to read a set of special duties into the use of the word "wharfinger", such a reading is a distortion of the clear language of the policy.  Regardless, as the examined *infra*, the Wharfinger Policy does not provide coverage for the dock collapse for various other reasons.

Essex next asserts that there is no coverage for the River Rouge Dock collapse because the policy only covers damage to a certain types of property.  Indeed, it is clear from the Wharfinger Policy that coverage extends only to accidental los or damage that may occur: "[t]o watercraft and equipment, cargoes, freights, and other interests on board while in the care, custody or control of the Insured" and "[t]o any property caused by said watercraft and their cargoes".  (Ex. I at 7).

In the current action there is no claim for damages relating to any watercraft or on board interests.  Any and all possible claims for damages appear to relate to the physical structure of the River Rouge Dock, Defendant Praxair pipes or loss of Morton's salt.  Further, as examined previously, the Wharfinger Policy language sets forth in Section B that any other property damage covered by the policy must have been caused by a watercraft and their on board cargoes. In this action, the physical structure of the dock failed and which may or may not have been caused by Morton's salt which was on the dock.  However, the language of the Wharfinger Policy only provides coverage for property damage caused by a watercraft and its on board cargo.  Therefore, there is no coverage for the dock collapse because it is not a type of covered

26

damage.

Finally, and most critically, the Wharfinger Policy only provides coverage for property damage and accidental loss to watercrafts, their cargo, or to property damaged by those same watercrafts and cargos if the loss "*result[s] from or aris[es] out of the Insured's mooring and docking operations.*"  (Ex. I at 7, emphasis added).  Essex asserts that the dock collapsed due to Defendant Praxair's leaking underground pipes.  Defendants Praxair and US Steel assert the fault lies with DBS for piling the salt too high and too close to the edge of the sea wall.  These theories are of no moment, however, because none of them implicate the "mooring and docking" process of a vessel.

DBS argues, on the other hand, that there is nothing in the record to indicate when the collapse of the dock structure began and therefore, Essex cannot show that the collapse did not begin at the time the vessel was being unloaded.  To this end DBS specifically noted at oral argument that "there is not a single person, a single expert" that could articulate the exact moment when the collapse began.  DBS argues the evidence only establishes when the collapse was discovered on the morning of January 28th and at that time the vessel was no longer present.  DBS argues that it is entitled to the inference that the collapse could have started to occur during the unloading process one full day earlier because there is nothing to show that it did not start at that time.

DBS's argument fails in several respects.  First, while DBS, as the non-moving party, is entitled to have this Court evaluate the facts in a light most favorable to it, this does not mean that DBS can set forth *no facts* and simply argue questions of material fact persist in the absence of those facts.  Federal Rule of Civil Procedure 56, requires that the non-moving party may not rest upon the mere allegations or denial of his pleadings but must set forth specific facts, by

27

affidavit or otherwise, which demonstrate that there is a genuine issue for trial. FED. R. CIV. P. 56(e). The rule requires that non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment). Here, DBS has set forth no facts to support the theory that the dock collapse "began" before the entire structure failed and a void opened and swallowed tons of salt. Rather, DBS candidly admits there is not a single person anywhere that knows when the vessel left the dock or when the collapse actually began, despite an entire day passing from when the salt was unloaded and when the structural collapse is discovered. Therefore, DBS's theory that the collapse began during the unloading process or that the vessel was still at the dock at the time the collapse began is not supported by even a scintilla of evidence. Further, DBS's theory is inapposite to the facts that are evidenced in record. Most notably is the "Inventory Report" from DBS itself with the handwritten notation:

> Vessel received on Jan 27/2011.
> Dock failure happened early on Jan 28th/2011 some load were shipped out prior to failure. Since only portion of the pile was on top of dock failure, we continued to ship out product that was good in order to mitigate the problem & get good product out of the way.
> We could also not cover the pile to protect salt, as we usually do, so best solution was to ship it out as soon as possible.

(Ex. N, at 6). This report states clearly that the collapse happened early on January 28, 2011 and that DBS was shipping out salt from that pile *prior* to the structural collapse of the dock on January 28th. Therefore, DBS's claims during oral argument that there had been "no movement" of the salt before the structural collapse are contradicted.

Given these facts, the Court finds that even viewing the record in a light most favorable

28

to DBS (and without having to determine the ultimate cause of the collapse) there is no genuine issue of material fact regarding whether the loss "results[] from or ar[ose] out of the Insured's mooring and docking operations." Accordingly, there is no coverage under the Wharfinger Policy for damages or losses relating to the River Rouge Dock collapse (including damages relating to the dock, the underground pipes or the loss of salt). Therefore, summary judgment on the issue of liability is appropriate in favor of Essex.

    3.  Exclusions

    Finally, the Court finds that even if DBS could carry its burden and show that the River Rouge Dock collapse was caused by a watercraft or the cargo on board that watercraft during the mooring and docking operations, coverage is still plainly and clearly excluded by the exclusions set forth in paragraph J of the Wharfinger Policy.

    There is no dispute that the River Rouge Dock is leased by DBS. (Ex. K, Lease; N. Frye Dep. at 11-12). Paragraph J of the Wharfinger Policy specifically excludes coverage for any damage or loss to property leased or rented by DBS. (Ex. I at 7). Therefore, there is no coverage for any damage or loss to the dock structure. Further, that same paragraph excludes coverage for any loss or damage to property "in the Insured's possession for storage". (Ex. I at 7). It is uncontested that the salt on the dock at the time of the collapse belonged to Morton. (Ex. N, Morton Unloading Receipt; N. Frye Dep. at 11-12). Therefore, there is also no coverage under the Wharfinger Policy because the claimed damages are specifically excluded.

## IV. CONCLUSION

    For all these reasons, the Court

(1) GRANTS Essex's Motion for Summary Judgment (Dkt. No. 215);

(2) DENIES as MOOT Essex's Objection to Magistrate's Order (Dkt. No. 184);

29

(3) DISMISSES DBS's Counter-claims against Essex (Dkt. No. 55).

SO ORDERED.


s/Paul D. Borman                           
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  July 23, 2014

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 23, 2014.


s/Deborah Tofil                             
Case Manager

30